UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| T.C.<br><br>    *Petitioner*,<br><br>    v.<br><br>BRIAN A. KYES, United States Marshal, District of Massachusetts,<br><br>    *Respondent*. | Docket No. |

**PETITION FOR HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241
AND INJUNCTIVE RELIEF**

1.  Petitioner T.C. is a seventeen-year-old natural-born U.S. citizen with no prior criminal history who is detained in federal custody pending an extradition hearing in the District of Massachusetts, and jailed at the Essex Juvenile Detention Center ("Essex") in Newark, NJ pursuant to contracts with and sole placement decisions made by the United States Marshal for the District of Massachusetts. *See In re Extradition T.C.*, 24-mj-01365-DLC (D. Mass).

2.  T.C. is seeking review of the Magistrate Judge's July 16, 2024 Order, *Id.* at Dkt. 71,[1] denying his request to transfer him to a Massachusetts Department of Youth Services ("Mass DYS") facility and the Marshal's decision to house T.C. in New Jersey, at least a five-hour drive

---

[1] T.C. previously appealed the Magistrate Judge's decision to the District Court pursuant to *United States v. Al-Nouri*, 983 F.3d 1096, 1098 (9th Cir. 2020) and *Matter of Requested Extradition of Kirby*, 106 F.3d 855, 859 (9th Cir. 1996), as amended (Feb. 27, 1997) (finding that *Wright v. Henkel,* 190 U.S. 40 (1903) incorporates an Article III judge's right to review a Magistrate Judge's bail decision in connection with an extradition proceeding). That appeal has been pending since August 16, 2024 and is an alternative mechanism for the relief requested herein. *See In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 104 (D. Mass). No Article III judge has been assigned to the proceeding. Accordingly, T.C. is additionally proceeding pursuant to 28 U.S.C. § 2241.

away from his attorneys and his Massachusetts based family, where he is housed with older, dangerous offenders (18-21 years old), where he was already assaulted, and where he remains under lockup in isolation in his cell for approximately 18-19 hours per day (and up to 23.75 hours on additional days). *See id.* at Dkt. 133 and 137. T.C. requested transfer under the distinct extradition framework that grants the Court the authority to issue an order "to the proper jail," 18 U.S.C. § 3184, rather than vesting the discretion solely with the Marshals or the government, 18 U.S.C. § 4086.[2]

3. Other than limited schooling, T.C. is mostly confined to his cell, continues to receive threats, and is fearful for his safety.[3] As noted by Dr. Elliot L Atkins in his report,[4] T.C. is suffering from "an acute stress disorder", has not received any mental health treatment at Essex despite requests, and is at risk of developing "debilitating posttraumatic stress disorder" unless conditions of his confinement change. Exhibit 1 to T.C.'s Appeal of Magistrate Judge's Order, *id.* at Dkt. 104.

4. Alternatively, T.C. is seeking review of the Magistrate Judge's July 9, 2024 Detention Order, *Id.* at Dkt. 59, denying bail because numerous special circumstances—including T.C.'s age and lack of a suitable facility — justify the release of T.C., who is not a flight risk or a danger, until a final judgment is made on extradition.

---

[2] The government took no position on the requested transfer, *see In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 81 at 3. The government also took the position that if the court was "inclined to release T.C.", to stay such order until it had an "opportunity to move T.C. to another facility, potentially to include the Massachusetts Department of Youth Services where T.C. has requested to be moved."

[3] T.C. was returned to school for only two days since July 20, 2024. He did not receive any additional schooling until September 5, 2024.

[4] Dr. Elliot Atkins, a retained child psychologist and therapist in Evesham, NJ, is working with T.C. to navigate these traumatic events.

**PARTIES**

5. Petitioner T.C., is a seventeen-year-old natural-born U.S. citizen who has family in Massachusetts and who, prior to his arrest, resided with his mother in Turkey. T.C. is presently in custody at Essex.

6. Respondent Brian A. Keyes is the United States Marshal for the District of Massachusetts. T.C., is in custody under the authority of Marshal Keyes, who, in his sole discretion, first made the decision to house T.C. at the Manson Youth Institution ("Manson") in Connecticut and then later transferred T.C. to Essex in New Jersey.

**JURSIDICTION AND VENUE**

7. Jurisdiction is proper in this Court, *inter alia*, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2241.

8. Venue is appropriate in this Court because T.C. was transported to Manson and then later Essex and continues to be housed at Essex under the direction of Marshal Keyes, pursuant to a Detention Order issued by Magistrate Judge Cabell in the District of Massachusetts.

**FACTUAL BACKGROUND**

9. On May 3, 2024, the United States sought an arrest warrant for T.C. in the United States District Court for the Southern District of Florida based on a request from the Turkish government. *See In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 5 (D. Mass). The extradition complaint alleges that T.C. was speeding in Istanbul, Turkey, and unable to swerve away from a disabled ATV on the side of the road when he accidentally caused the death of one ATV passenger and injuries to others. T.C. was not alleged to have been intoxicated, nor to have shown any disregard for his circumstances. *Id.* Rather, after the accident he and the others with him remained on site for approximately forty minutes waiting for the ambulance, firetruck and police to arrive.

After help arrived, T.C.'s mother picked up T.C. and certain of his friends, and thereafter determined that she and T.C. would leave Turkey for the United States, where T.C. had citizenship. T.C.'s mother purchased airline tickets and otherwise made travel arrangements. Throughout, T.C. obeyed his mother, and neither planned nor requested to be removed from Turkey.

10.   T.C.'s mother took T.C. to the United States rather than remain in Egypt, the first leg of their trip from which extradition would have been unlikely or impossible, *see In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 92 at 2 (D. Mass). T.C. has close family ties in Massachusetts; his aunt, uncle, and cousin are long-term residents. *Id.* at Dkt. 86 at 2-3. When T.C. was younger, they visited him in Turkey and T.C. visited them in the United States. *Id.* After T.C.'s mother brought him to Massachusetts, they first settled in an AirBnB on Plum Island and then subsequently signed a one-year lease in Haverhill. *Id.* at Dkt. 92 at 2. During this time, T.C. saw his aunt and uncle on multiple occasions. *Id.* T.C.'s aunt assisted him with his medical care, including receiving treatment for his skin condition and his dental care. *Id.* at Dkt. 86 at 2-3. T.C.'s mother even enrolled him in Haverhill Public Schools and, at the time of the arrest, was exploring private school options in the area so that T.C. could be close to his U.S.-based family. *Id.* at Dkt. 92 at 2. Following T.C.'s arrest, his aunt and uncle made the long drives to visit T.C. in Connecticut and then New Jersey. *Id.* The significant physical distance between them, the limited visiting hours, and the limited ability to make phone calls, have made regular contact impossible.[5]

11.   T.C. was arrested while visiting schools in the District of Massachusetts on June 14, 2024. That same day, the government filed its request for Detention Pending Extradition

---

[5] Essex's visiting policy applicable to all juveniles allows only a single visitor on Saturday for one hour. The visit must be prescheduled. No juvenile is permitted to have more than one visitor at a time, such that his aunt and uncle are not permitted to visit together. No visits occur on any day of the week other than Saturday. Moreover, the scheduled one-hour visit has ordinarily been cut short to no more than 30 minutes.

Proceedings. *In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 7 (D. Mass).

*Incarceration at Manson Youth Institute*

12. After T.C's first appearance, he was transported, based on the Respondent's decision, to Manson Youth Institution in Cheshire, Connecticut, described on its own website as, "a level 4 high-security facility." *See https://portal.ct.gov/doc/facility/manson-yi*. The Marshals' did not transport T.C. to Mass DYS, despite representations by the agency that they are willing and able to house T.C., because they lacked contracts with Mass DYS and because both Manson and Essex were cheaper. *In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 65 and 86 (D. Mass).

13. Once T.C. arrived at Manson on June 14, 2024, he was kept in isolation without any belongings for three days in a room that was lit 24 hours a day. *Id.* at Dkt. 22. His isolation was not due to any perceived rule infraction or mental health issue. *Id.* Moreover, T.C. was not provided the opportunity during this time to call his father in Turkey and was housed with convicted offenders. *Id.* at Dkt. 29 and 40.

14. Counsel for T.C. additionally determined that:

   a. Manson unlawfully disclosed to journalists, in violation of T.C.'s privacy rights, a booking photo taken by Manson correction staff of T.C. in his prison garb, along with a screenshot of the computer entry showing the time of booking and personally identifying information, *Id.* at Dkt. 29;

   b. T.C., according to his reports, had been questioned by a Manson corrections officer about the facts relating to the crime that he allegedly committed and asked whether he actually committed the crime. Such interrogation of a represented juvenile outside of the presence of his lawyer, and without the consent of his parent or guardian, is a violation of T.C.'s constitutional right to due process, right to counsel, and right against self-incrimination, *id.*; and

   c. Boston Police Department, presumably by agreement with United States Marshals, released Boston Police Department body camera footage of T.C.'s arrest and body pat search pursuant a Freedom of Information Act ("FOIA") request by the Turkish press – which is predominantly controlled by the Turkish government. The released footage has an electronic block over T.C.'s face, however, his identity is still plain based on the

circumstances, the audio, and the portions of his head and body that remain visible throughout the video in violation of T.C.'s privacy as a juvenile. *Id.* at Dkt. 50.

*Bail Request and Detention Order*

15.     On June 18, 2024, T.C. filed his request for release from custody arguing *inter alia* that T.C.'s age, the unconstitutional conditions at Manson, and the ongoing violations of his constitutional and privacy rights constituted "special circumstances" warranting his release on bond and offering to post, through his father: (1) a $200,000 USD cash bond to be deposited with the court, which will come from T.C.'s father's borrowing funds from family and friends or (2) a $2 million bond executed by the father and secured by the father's home in Turkey, which is free and clear of encumbrances. On top of these financial conditions, T.C. agreed to stay with his relatives in Massachusetts under their supervision and care and to be subject to strict conditions including a curfew or even house arrest,[6] surrender of any travel documents, and any other condition that Magistrate Judge Cabell believed would, in the aggregate, assure his appearance. *In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 22, 26, 28, 29, 40, 41, 50, 53, 86.

16.     Magistrate Judge Cabell denied T.C.'s request for bail on July 9, 2024, *see Id.* at Dkt. 59. In his bail decision, Magistrate Judge Cabell considered T.C.'s conditions of confinement, as articulated by affidavits submitted by counsel, *see Id.* at Dkt. 22, 26, 28, 29, 40, 41, 50, 53, 86, but rejected defense counsel's concerns, finding none to constitute "special circumstances", and finding that although Manson had some concerning attributes similar to an adult prison, the "more concerning aspects of T.C.'s detention at Manson have had to do with short-lived restrictions related to his orientation." *Id.* at Dkt. 59 at 27. Additionally, while Magistrate Judge Cabell found T.C. to be a flight risk, in part based on his assessment that "T.C.

---

[6] T.C.'s aunt offered to be a responsible third-party trustee/*de facto guardian ad litem* to monitor T.C. and report any conduct that would not conform with any conditions of release. Dkt. 86.

actively took part in fleeing the scene of the accident and thereafter the country", he nonetheless assumed "without deciding the issue that it would be possible to fashion a set of conditions to adequately mitigate the risk of flight." *Id.* at 18 (internal citation and quotations omitted).

*Incarceration at Essex*

17. On July 12, 2024, shortly after Magistrate Judge Cabell's order, the Marshals exercised its authority to move T.C. to the Essex County Juvenile Detention Center in Newark, NJ due to T.C.'s valid and truthful complaints regarding the conditions at Manson, which counsel had presented to the Court. *In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 74. The Marshals chose Essex despite knowledge that Mass DYS was willing and able to take T.C. into their custody. *Id.* at Dkt. 65. The decision ignored counsel's requests to place T.C. into a Massachusetts Department of Youth Services facility.

18. Essex was worse than Manson. T.C. was again housed with adults in his unit. *See In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 65, 74, 86. Essex had even less programming . *Id*. Furthermore, Essex is farther from his lawyers and local aunt and uncle, leaving T.C. even more isolated. *Id.* Based on these worsening conditions of confinement, T.C. requested Magistrate Judge Cabell to order the Marshals to transfer him to a Mass DYS facility, *see In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 65, a motion which was denied on July 16, 2024, *Id.* at Dkt. 71. Instead, Magistrate Judge Cabell offered, in his discretion, to ask the Marshals to transfer T.C. back to Manson if T.C. so requested. *Id.* at Dkt. 71. The following day, T.C. made a request to Magistrate Judge Cabell to be transferred back to Manson. *Id.* at Dkt. 72. Manson, however, refused to take T.C. because of the allegations against Manson in counsel's filings. *Id.* at Dkt. 74.

19. Just days after his transfer to Essex, on July 17, 2024, T.C. was brutally assaulted. *In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 74. Specifically, three perpetrators attacked T.C.

from behind as he walked away from the telephone, and then punched T.C. in the face and beat him about the head. T.C. was taken to the hospital and received stitches to his lip. He also had abrasions and a loose tooth. According to Essex internal reports, the assault was entirely unprovoked; T.C. was assaulted because he asked to use the phone when it was his turn. *Id.* Following the assault, T.C. was moved to a specialized unit for his own safety where, for the first three weeks, he remained in his cell for 18-19 hours of every day – for the first two weeks without even a book to read. *Id.* at Dkt. 96 (filed partially under seal).[7] As of the date of the filing of Dkt. 133, the unit was frequently on lockdown, at which point T.C. is locked in his cell for 23.75 hours of the day. *Id.*; Dkt. 133. Moreover, the unit unlawfully houses juveniles under the age of 18 (such as T.C.) with adults aged 18-21, some of whom are sentenced and awaiting designation and others convicted and awaiting sentence. From July 20 – September 5, T.C. attended school twice. *Id.* at Dkt. 133. T.C. has been outside twice. *Id.* And, has been taken to the library once. *Id.* Otherwise, he remains in his cell for 18-23.75 hours per day, sometimes without running water. *Id.*

20. Moreover, T.C. continues to feel unsafe and isolated because "he is subjected to continuing and ongoing threats of violence", and is now exhibiting symptoms of "acute stress disorder". Exhibit 1 to Dkt. 104. Dr. Atkins, who was retained by counsel and who examined T.C., notes in his report that T.C. "was hypervigilant, jumpy, and on edge", "constantly on the lookout for danger", and experiencing "frequent flashbacks of his being assaulted by fellow detainees". *Id.* T.C. additionally continues to receive "multiple threats to be beaten up" and his "repeated[]" requests for "mental health treatment" have been unanswered. Dr. Atkins believes T.C. is suffering from "acute stress disorder" and believes that unless "a less traumatogenic environment can expeditiously be arranged", T.C.'s conditions will "deteriorate and that he will be saddled with a

---

[7] T.C. received three books that he has long finished. T.C. has not been subsequently taken to the library. Dkt. 133.

debilitating posttraumatic stress disorder." *Id.*

*Denial of Transfer to Massachusetts DYS*

21. On July 16, 2024, Magistrate Judge Cabell denied T.C.'s requested transfer to a Massachusetts Department of Youth Services facility. *In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 71. A further request to reconsider was made on July 19, 2024, following an assault on T.C., Dkt. 74, and a request to expedite an order on this request was made on August 5, 2024, Dkt. 96. Despite an August 9, 2024, order from Magistrate Judge Cabell that the Court "will issue a ruling on the pending motion to reconsider in the near future," Dkt. 98, no decision has been made. After additional requested briefing, *see* Dkt. 126, 132, and 133, Magistrate Judge Cabell issued an additional order on September 9, 2024 stating that the court "intend[s] to rule imminently on the relator's motion for reconsideration of the order denying his release from the facility in New Jersey." No order has been issued to date.

22. T.C. has now been incarcerated for more than three months. His request for transfer to Mass DYS was denied on July 16, 2024 and reconsideration of that order has been pending since July 19, 2024. Litigation over T.C.'s extradition is unlikely to be resolved for many months, if not years. T.C.'s extradition hearing is scheduled for October 15, 2024. If T.C. is unsuccessful, he intends to challenge the extradition with the Secretary of State and subsequently with this Honorable Court and the Court of Appeals pursuant to 28 U.S.C. § 2241. During this period, the law requires that T.C. be held at a suitable facility, in this case Mass DYS, and not be detained in unlawful conditions akin to solitary confinement in a unit with adults that have caused him to suffer both physically and mentally. *See* 18 U.S.C. § 3184. Indeed, even the government implicitly agrees that Essex is not the appropriate facility to house T.C. *See* Dkt. 132 at 4 (requesting "the opportunity to move T.C. to another facility, potentially to include the Massachusetts Department

of Youth Services where T.C. has requested to be moved" in the event the court is "inclined to release T.C. based on the conditions of his confinement at Essex JDC").

23. Alternatively, T.C. should be released on bail because he does not pose a serious risk of flight and the "special circumstances" of this case warrant it.

24. To the extent that T.C. came to the United States rather than remain in Turkey after the accident, he was sixteen and obeyed his mother, who decided they should leave for the United States where they have close family. T.C. has no independent resources or travel documents. Any risk of flight can readily be mitigated by conditions of release which include GPS monitoring[8] and additional monitoring by his Massachusetts-based aunt as a third-party custodian.

25. "Special circumstance" in this case readily exists, considering T.C.'s age and his continued detention at Essex where he was subject to physical abuse, and remains at risk of future abuse as well as mental harm resulting from prolonged isolation, are quintessential "special circumstances" warranting bail. *See Hu Yau-Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir. 1981) (special circumstances existed for 16-year-old British subject to extradition proceedings); *see also Matter of Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994) ("this single factor may in the appropriate case amount to 'special circumstance'").

## COUNT I

### Violation of Eighth Amendment to the Constitution

26. Petitioner re-alleges and incorporates paragraphs 1 through 25 above, as if fully set forth herein.

27. The Eighth Amendment to the United States Constitution guarantees, among

---

[8] Defense counsel for T.C. contacted SCRAM Systems, which supplies GPS bracelets for courts throughout the Commonwealth of Massachusetts, and provided the Court with a copy of the proposed contract for T.C. to be placed on GPS monitoring. *In re Extradition T.C.*, 24-mj-01365-DLC, Dkt. 86.

other things, that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted"

28. T.C. does not pose a flight risk or a danger, as evidenced by the facts above. Moreover, ample "special circumstances" exist to warrant bail.

29. The lack of access to adequate mental health support and services, Essex's unconstitutional practices, as well as T.C.'s age have caused and will continue to cause a serious deterioration in T.C.'s health if he remains confined.

30. The court violated T.C.'s Eighth Amendment by failing to grant T.C.'s bail pending the outcome of a final extradition hearing and T.C.'s requested transfer to a Massachusetts Department of Youth Services facility.

## COUNT II

### Violations of the Fifth Amendment to the Constitution

31. Petitioners re-allege and incorporate paragraphs 1 through 30 above, as if fully set forth herein.

32. "The due process guarantee of the Constitution obliges the government 'to refrain at least from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health.'" *Savino v. Souza*, 2020 WL 1703844, at *6 (D. Mass. Apr. 8, 2020) (quoting *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011)).

33. By placing T.C., a presumed innocent seventeen-year-old citizen, at Essex that houses convicted felons under the age of 21 and confining T.C. for 18-23.75 hours per day in a cell, without access to mental health treatment, educational resources, or outdoor activities, Respondent has disregarded an excessive risk to T.C.'s health and safety and has failed to provide adequate safeguards to protect T.C. from a serious risk of harm, including to his physical and

mental health.

34. Respondent's failure to protect T.C. from these conditions, including by releasing them from the conditions altogether or placing him in an appropriate facility constitutes deliberate indifference to the Petitioners' needs, thereby establishing a violation of the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner requests that the Court immediately grant the following relief:

a. Issue a preliminary/permanent injunction ordering the government to transfer T.C. to a Massachusetts Department of Youth Services facility;

b. Issue a Writ of Habeas Corpus and/or any appropriate order immediately ordering the government to transfer T.C. to a Massachusetts Department of Youth Services facility, or, in the alternative releasing Petitioner from confinement subject to reasonable conditions; and

c. Grant Petitioner such other and further relief as the Court may deem just and appropriate.

Respectfully Submitted,

T.C., a Juvenile
By his attorneys,

*/s/ Martin G. Weinberg*
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza
Suite 1000
Boston, MA 02116
(617) 227-3700

*/s/ Victoria Kelleher*
Victoria Kelleher
Kelleher & Maceo, P.C.
BBO #637908
53 State Street
Suite 500
Boston MA 02109
(978) 744-4126

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true copy of this document was served on all counsel of record this day, September 25, 2024, and with the United States District Court, District of Massachusetts, 1 Courthouse Way, Boston, 02210.

                                                **/s/ Martin G. Weinberg**
                                                Martin G. Weinberg, Esq.