IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| T.C., | ) | |
|     Petitioner, | ) | |
| | ) | |
| v. | ) | No. 24-cv-12458-ADB |
| | ) | |
| BRIAN A. KYES, United States Marshal, | ) | |
| District of Massachusetts, | ) | |
|     Respondent[1] | ) | |

**GOVERNMENT'S RESPONSE TO T.C.'S AMENDED PETITION
FOR HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

The Republic of Türkiye ("Türkiye") seeks the extradition of T.C. pursuant to the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (the "Treaty"), so that he may be prosecuted for the charge of Causing Reckless Killing and Injury, in violation of Article 85 of the Criminal Code of Türkiye. T.C. is accused of killing one person and injuring four others when he crashed into them while driving his mother's Porsche without a driver's license late at night on March 1, 2024 on a dark and winding road at a speed approximately 87 miles per hour above the speed limit. Within hours of the crash, T.C. and his mother fled Türkiye for the United States, via Cairo, Egypt.

On February 11, 2025, Chief U.S. Magistrate Judge Donald L. Cabell issued a 38-page Order denying T.C.'s motion to dismiss and holding that he would certify T.C.'s extradition to the Secretary of State. T.C. now seeks habeas relief under 28 U.S.C. § 2241 and requests that the Court

---

[1] This action incorrectly names Brian A. Kyes, U.S. Marshal for the District of Massachusetts, as respondent. The proper respondent is T.C.'s immediate custodian, Sako Long, Regional Director, Northeast Region, Commonwealth of Massachusetts Department of Youth Services. This misnomer does not affect the parties' substantial rights.

reverse the denial of his motion to dismiss and vacate the certificate of extraditability on the sole ground that he has not "been charged with an offense" under the Treaty. Because T.C.'s narrow reading of the Treaty is inconsistent with the text of the Treaty and case law interpreting similar language, his habeas petition should be denied.

## BACKGROUND

### I.    Legal Background

"In the United States, the procedures for extradition are governed by statute." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997). These statutes, 18 U.S.C. §§ 3181 *et seq.*, establish "a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State." *Id.* (footnote omitted). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *Id.*

Under 18 U.S.C. § 3184, the judicial officer serving as the extradition court—here, the Magistrate Judge—"upon complaint, issues an arrest warrant for an individual sought for extradition" and then conducts a hearing to determine if "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." Specifically, the extradition court determines whether (1) it is authorized to conduct the extradition, (2) it has jurisdiction over the fugitive, (3) the applicable treaty is in full force and effect, (4) the treaty covers the offenses for which extradition is sought, and (5) there is probable cause to believe the fugitive committed the alleged offenses. *See* 18 U.S.C. § 3184; *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984). If the Court finds that the requirements for certification are satisfied, it shall provide the

certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it shall order the fugitive detained to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184; *see also Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828 (11th Cir. 1993). The Secretary will then decide whether to surrender the fugitive to the requesting country. 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct its foreign affairs.") (citations omitted).

A fugitive cannot directly appeal a certification order, but may seek limited review by filing a petition for writ of habeas corpus. *See, e.g.*, *Kin-Hong*, 110 F.3d at 107-108 & n.3; *Koskotas v. Roche*, 931 F.2d 169, 171 (1st Cir. 1991).

## II.    Factual Background[2]

According to Turkish authorities, on the night of March 1, 2024, T.C. was driving a Porsche owned by his mother, Eylem Tok. Ex. C at 4, 6, 19, 29, 38, 42, 44, 47, 55. In addition to T.C., there were three passengers in the car: one in the front, A.K., and two in the back, A.A. and B.A. *Id.* at 4, 6-7, 39, 40, 42-43, 45, 47. T.C.'s friend, D.O.O., was driving another vehicle, also with passengers, directly behind T.C.'s vehicle. *Id.* at 7, 38-39, 45. According to statements provided by T.C.'s friends to Turkish authorities, around 11:20 p.m., T.C. suddenly began driving his vehicle faster after they passed a speed bump in the road. *Id.* at 5, 25, 27, 29, 38. While the speed limit on the road was 30 kilometers per hour (approximately 18 miles per hour), T.C. was driving 170-180 kilometers per hour (approximately 105 to 111 miles per hour). *Id.* at 5-6, 37. The passengers requested that T.C. slow down, but he did not do so. *Id.* at 6-7, 40, 43. The passengers

---

[2] The facts in this section are taken from Türkiye's Request for the Extradition of T.C. ("Extradition Request"), a redacted copy of which is filed as Exhibits A through C hereto. An unredacted copy was filed under seal at Dkt. 18-2.

then put on their seat belts "just in case." *Id.* at 40. T.C.'s vehicle approached a curve in the road, and according to T.C.'s friends, T.C. was driving too fast through the bend. *Id.* at 6-7, 39-41, 43. At the same time, five individuals with all-terrain vehicles ("ATVs") had stopped on the right side of the road just past the bend, where they were trying to fix one of the ATVs that had broken down. *Id.* at 5, 13, 15-16, 18. In an attempt to avoid hitting the people on the side of the road, T.C. suddenly turned the steering wheel to the left, but the sudden turn caused the car to skid and crash into them. *Id.* at 6-7, 39-41, 43. T.C.'s car ended up in a water channel on the other side of the road and the airbags deployed. *Id.* at 6-7, 39, 41, 43, 45. After the crash, T.C. and his passengers got out of the vehicle. *Id.* Two of the ATV riders (I.G. and H.T.) were lying on the side of the road, two (S.K. and O.M.A.) had been knocked down a cliff, and one (T.A.) was under T.C.'s car. *Id.* at 5, 7, 13, 16, 39, 41, 43, 45. O.M.A. died from internal bleeding as a result of the crash; T.A. suffered life-threatening injuries; I.G. was in shock, lost consciousness, and suffered serious injuries; H.T. was injured and lost consciousness; and S.K. was also injured. *Id.* at 4-5, 13, 16, 18. After the crash, witnesses reported hearing T.C. repeatedly say, "My life is over." *Id.* at 7, 41, 43.

According to witnesses, T.C. and his friends had been driving around for some time before the crash and had stopped at a liquor store to buy cigarettes. *Id.* at 38-39, 44-45. None of the passengers in T.C.'s or D.O.O.'s vehicles reported to authorities that T.C. had been intoxicated, although T.C. fled the scene before any tests could be performed. *Id.* at 7. A mechanical engineer examined the Porsche that T.C. was driving and found no mechanical issues that would have caused the car to malfunction. *Id.* at 37. Neither T.C. nor his friends had driver's licenses. *Id.* at 6-7, 45.

Immediately after the crash, T.C. called his personal driver and Tok. *Id.* at 39, 45. About ten minutes later, T.C.'s mother, Eylem Tok, arrived at the scene and took T.C. and two of his

4

friends, D.O.O. and A.K., home. *Id.* T.C. then fled Türkiye. *Id.* at 7. Surveillance footage at the airport reflects that T.C. and Tok arrived at the airport by 2:11 a.m. on March 2, 2024, barely three hours after the crash. *Id.* at 49. T.C. and Tok traveled to Cairo and continued on to the United States, landing in New York later that day. *Id.* at 4, 7, 51-52.

## III.    Procedural Background

On March 7, 2024, a judge of the Istanbul 7th Criminal Judgeship of Peace issued an arrest warrant for T.C. for the offense of Causing Reckless Killing and Injury. Ex. C at 59. The arrest warrant lists, "Offense Charged Against the Accused: Causing Reckless Killing and Injury." *Id.* The judge issued the arrest warrant after examining the investigation file and finding "the existence of strong suspicion pointing to commission of an offence, the child pushed to offence committed the offence imputed on him and there has been a reason for detention." *Id.* at 57. The judge further found, "By taking into consideration the sanctions . . . for the offence . . . upper limit of the penalty and concrete evidence in the file pointing to commission of the offence by the child [T.C.], it has been decided to issue an arrest warrant for the child to detain him . . . ." *Id.*

On April 3, 2024, Türkiye transmitted its Extradition Request. Ex. A at 4. The certificate accompanying the Extradition Request, signed by the U.S. Ambassador to Türkiye and bearing the seal of the U.S. Embassy at Ankara, states that T.C. was "charged with the crime of causing reckless killing and injury." *Id.* at 44. After vetting by attorneys at the Departments of State and Justice, the Southern District of Florida swore out a complaint for the extradition of T.C. on the charge of Causing Reckless Killing and Injury, and a magistrate judge in that district issued a warrant for T.C.'s arrest. Exs. D & E. T.C. was arrested in Boston on June 14, 2024.

In October 2024, the Magistrate Judge held an extradition hearing under 18 U.S.C. § 3184. After holding that hearing and considering the parties' extensive briefing, the Magistrate Judge

held that he would certify T.C.'s extradition to the Secretary of State under 18 U.S.C. § 3184. Dkt. 18-1 at 1, 38. Among other things, the Magistrate Judge found that (1) he had authority to conduct the extradition proceeding, (2) the court had jurisdiction over T.C. because he was arrested in Massachusetts, (3) the Treaty was in full force and effect, (4) the charge of Causing Reckless Killing and Injury, in violation of Article 85 of the Turkish Criminal Code, was covered by the Treaty, and (5) there was probable cause that T.C. committed the offense of Causing Reckless Killing and Injury. In reaching these conclusions, the Magistrate Judge rejected T.C.'s argument that his conduct did not cause O.M.A.'s death, instead finding "the evidence is overwhelming that T.C. caused the death of O.M.A." Dkt. 18-1 at 33. The Magistrate Judge also rejected T.C.'s contention that Türkiye was seeking his extradition for "a possible, yet-to-be-determined prosecution," and instead found, consistent with case law considering similarly worded treaties, that the Treaty does not require that T.C. be formally charged with an offense, because the term "charged" is "synonymous with accused," and "the arrest warrant, prosecutor's report, and other documents in the extradition file establish that T.C. is accused of committing the article 85 offense." *Id.* at 20-31.

On February 25, 2025, T.C. filed his Amended Habeas Petition, and on March 10, 2025, supplemented that petition with a memorandum of law. Dkts. 18, 22. While raising irrelevant and obsolete arguments about T.C.'s prior detention at the Manson Youth Institution in Cheshire, Connecticut and the Essex Juvenile Detention Center in Newark, New Jersey—where T.C. has not been held since October 2024—T.C. ultimately challenges only one of the Magistrate Judge's findings: that T.C. is "being prosecuted for or [has] been charged with an [extraditable] offense" in compliance with Article 1 of the Treaty. As explained below, T.C.'s argument imputes a

requirement that does not exist in the Treaty and has been repeatedly and consistently rejected by courts considering similar treaty provisions.

## ARGUMENT

### I.    Standard of Review

In the extradition context, habeas corpus review is available "only to inquire [1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty and [3], by a somewhat liberal extension, whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) (emphasis added); *see also Kin-Hong*, 110 F.3d at 110. This review is "not meant to be 'a means for rehearing what the magistrate already decided.'" *Koskotas*, 931 F.2d at 171 (quoting *In re Extradition of Manzi*, 888 F.2d 204, 205 (1st Cir. 1989) (quoting *Fernandez*, 268 U.S. at 312)).

Where, as here, the Court must interpret the requirements of the Treaty, the first step is to begin with its text. *Medellin v. Texas*, 552 U.S. 491, 506-07 (2008) (citing *Air France v. Saks*, 470 U.S. 392, 396-97 (1985)). Unlike criminal statutes, extradition treaties are to be construed liberally in order to effectuate their purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."); *In re Extradition of Nezirovic*, No. 12-mc-00039, 2013 WL 5202420, at *5 (W.D. Va. Sept. 16, 2013) ("Treaties are construed liberally to favor the obligation to surrender fugitives.") (citation omitted). Further, deference is owed to the treaty partners on the meaning of the terms in a treaty. *See, e.g.*, *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) (giving deference to the interpretation of a treaty provision as set forth in diplomatic notes exchanged between the responsible agencies of the United States and Yugoslavia); *Arias Leiva v. Warden*, 928 F.3d 1281 (11th Cir. 2019) (finding that the U.S.-Colombia extradition treaty was in full force and effect

because, *inter alia*, both the United States and Colombia understand it to be in effect); *see also BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) (courts must "give 'the specific words of [a] treaty a meaning consistent with the shared expectations of the contracting parties.'") (quoting *Air France*, 470 U.S. at 399). Even where a treaty's text is ambiguous, if it "reasonably accommodates" the government's construction, the court "defers to that construction whether or not it is a construction we would adopt de novo." *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021) (citing *Kin-Hong*, 110 F.3d at 110).

## II.    The Treaty Does Not Require Formal Charges

Nothing in the Treaty requires Türkiye to issue a formal charge, such as an indictment or criminal complaint, before T.C. can be extradited. Article 1 of the Treaty provides for the extradition of persons "who are being prosecuted for or have been charged with an offense, or convicted of an offense, or are sought by the other Party for the enforcement of a judicially pronounced penalty for an offense . . . ." Ex. A at 8. There is no reference to formal charges or indictment. If formal charges were required to obtain extradition in a pre-conviction case, such as this one, there would be no need for Article 1 to expressly cover both individuals "who are being prosecuted" *and* "who have been charged." Indeed, the alternative phrasing of the treaty language signals that the treaty partners intended to allow for extradition of a person who has been charged with an offense irrespective of whether the person is being prosecuted for the offense. *See Aguasvivas*, 984 F.3d at 1058 (declining to adopt interpretation that would render treaty language "entirely superfluous").

As the Magistrate Judge found, this interpretation is consistent with the plain meaning of the verb "to charge": "[t]o accuse (a person) of an offense." Charge (vb.), Black's Law Dictionary (12th ed. 2024). The Arrest Warrant and supporting decision make clear that T.C. is accused of

committing the offense of Causing Reckless Killing and Injury. Ex. C at 57-59. In arguing to the contrary, T.C. relies on the meaning of the noun "charge," which is a "formal accusation of an offense as a preliminary step to prosecution." Charge (n.), Black's Law Dictionary (12th ed. 2024). But Article 1 does not refer to "a charge," the noun, but rather to persons who "have been charged," the verb—in other words, persons, like T.C., who have been accused of an offense.

The omission of any reference to a charging document in Article 7 of the Treaty, which lists the items that must be included in the extradition request, further confirms this reading. Ex. A at 13-14 (extradition request must contain the warrant for arrest, a statement of the facts, evidence sufficient to justify arrest and committal for trial, evidence sufficient to establish that the person sought is the person named in the warrant, and the text of the laws governing the offense, punishment, and statute of limitations). As the Magistrate Judge found, "the fact that Türkiye and the United States in the Treaty did not require the extradition file to contain any document regarding a charge in Article 7 reinforces that they did not intend to require the fugitive to be formally charged in Article 1." Dkt. 18-1 at 23 (citing *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1448, n.3 (9th Cir. 1987)); *see also Manrique v. Kolc*, 65 F.4th 1037, 1043 (9th Cir. 2023) ("our rules of interpretation militate against reading in a requirement of particular formal charges where the treaty makes no such specification").[3]

---

[3] T.C.'s concern about the "rule of specialty" (that an extraditee can only be prosecuted or punished for the specific offenses for which they were extradited), Dkt. 22 at 6, is without merit. Türkiye's extradition request specifically states that, if the U.S. government does not consent, T.C. "shall not be tried for any offense other than the one which is subjected to the extradition procedure"—here, Causing Reckless Killing and Injury in violation of Article 85 of the Turkish Criminal Code. Ex. C at 9.

Every circuit to consider arguably less flexible language in extradition treaties has concluded that formal charges are not required and that extradition for further investigation and prosecution is permissible.

As a matter of first impression, the Seventh Circuit found that similar language in the U.S.-Sweden Extradition Treaty did not require formal charges. *Matter of Assarsson*, 635 F.2d 1237 (7th Cir. 1980), *cert. denied* 451 U.S. 938 (1981). The extradition request in *Assarsson* included an arrest warrant issued by a Swedish court, although no formal charging document had yet been filed. *Id.* at 1239. Like the Treaty here, the treaty in *Assarsson* provided for the extradition of "those persons found in its territory *who have been charged* with or convicted of any of the offenses specified in Article II . . . ." *Id.* (quoting U.S.-Sweden Treaty) (emphasis added). The Seventh Circuit found that the "word 'charge' is thus used in contrast to 'convicted'" and the term "charged" "is used in the generic sense only to indicate 'accused.'" *Id.* The court found that the documents that must accompany the extradition request—including a "'duly certified or authenticated copy of the warrant of arrest or other order of detention'"—did not include a formal charging document. *Id.* at 1243 (quoting U.S.-Sweden Treaty). The absence of a requirement that the requesting party provide a copy of a charging document in the extradition request led the court to conclude that formal charges were not a prerequisite to extradition. *Id.*[4]

---

[4] T.C. suggests—without any citation—that two-thirds of the U.S. Senate and President Carter could not have intended to permit extradition "for anything less than an ongoing criminal prosecution or formal charge" and that the U.S. signatories to the Treaty "purposefully used the terms 'charged' or 'being prosecuted' in the sense understood within U.S. criminal law," which T.C. argues means formal charges. Dkt. 22 at 7-8. But notably, *Assarson*, decided one year after the Treaty was initially signed and *before* the Treaty entered into force on January 1, 1981, *see* Ex. A at 5, held that a treaty with nearly identical language requiring extradition of persons who "have been charged" did *not* require formal charges, in part because "charged" was used in the generic sense only to indicate 'accused.'" 635 F.2d at 1239. In other words, at the time the Treaty was ratified, the word "charged" in U.S. criminal law was understood to mean simply accused, and still is. Charge (vb.), Black's Law Dictionary (12th ed. 2024).

In *Emami*, the Ninth Circuit relied on the reasoning of *Assarsson* to hold that an individual sought for "'detention for investigation'" without formal charges could be extradited under the terms of the U.S.-Germany Extradition Treaty. 834 F.2d at 1446. That treaty provided for the extradition of persons "'*who have been charged with an offense* or are wanted by the other Contracting Party for the enforcement of a judicially pronounced penalty or detention order . . . .'" *Id.* at 1448 (quoting U.S.-Germany Treaty) (emphasis added). Like the treaties here and in *Assarsson*, the U.S.-Germany Treaty required the requesting party to include in the extradition request the arrest warrant but not a formal charging document. *Id.*

The Second Circuit weighed in on this issue in *Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009). There, the U.S.-Serbia Extradition Treaty "authorize[d] the extradition of an individual *who has been 'charged'* with a crime." *Id.* at 54 (quoting U.S.-Serbia Treaty) (emphasis added). Despite that "Bosnia had failed to charge him formally with an extraditable offense," the Second Circuit agreed that the interpretation of "charged" did not require a formal charging document because "it gives meaning to treaty language stating that an individual must be 'charged' with an offense in order to be extradited, while avoiding unwarranted incursions into the fine details of foreign criminal procedure." *Id.* at 65.[5] Ultimately the Second Circuit held Sacirbey was not extraditable, not because formal charges were lacking, but because the Bosnian court that issued his arrest warrant had been dissolved, and thus Bosnia could not satisfy the requirement of providing a valid arrest warrant with the extradition request. *Id.* at 66-67.

In *Manrique*, the Ninth Circuit went even further and held that the U.S.-Peru Extradition Treaty, which required Peru to submit "a copy of the charging document" with its extradition

---

[5] Similarly, the Ninth Circuit chose not to wade into whether there had been compliance with foreign criminal procedure in *Emami* "both out of respect for German sovereignty and because we recognize the chance of erroneous interpretation." 834 F.2d at 1449.

request, still did not mandate a "formal charge" because the treaty there provided for extradition of persons "'the authorities in the Requesting State *have charged with*, found guilty of, or sentenced for, the commission of an extraditable offense.'" 65 F.4th at 1041-43 (quoting U.S.-Peru Treaty) (emphasis added). Because "the ordinary meaning of the verb 'charge' is to generally accuse someone of a crime," the "charging document" requirement of the U.S.-Peru Treaty, which "specifie[d] no particular document," was satisfied by a document that identified the crimes the fugitive was accused of and summarized the supporting evidence. *Id.*

Although in dicta, the First Circuit commented on this issue in *Aguasvivas*, 984 F.3d at 1060. There, the court stated, "we readily agree with the holdings and the rationale in both *Emami* and *Assarsson*" and "we could rule for the government in this case were the language of this treaty materially similar to the language of those treaties." *Id*. However, the language in the U.S.-Dominican Republic Extradition Treaty at issue in *Aguasvivas* is materially different from the treaties addressed in *Assarsson* and *Emami* and the U.S.-Türkiye Treaty. The U.S.-Dominican Republic Treaty required, in addition to an arrest warrant, "'a copy of the document setting forth *the charges* against the person sought.'" *Id.* at 1055 (quoting U.S.-Dominican Republic Treaty) (emphasis added). In considering whether an arrest warrant could do double duty, the First Circuit held that such a reading "would render superfluous a relatively bespoke requirement" of a separate document setting forth the charges—a requirement not present in the U.S.-Türkiye Treaty.

The Fourth Circuit's decision in *Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023), does not change the analysis. There, the U.S.-Lithuania Extradition Treaty specifically required "'a copy of the charging document.'" *Id.* at 363 (quoting U.S.-Lithuania Treaty). In the face of this explicit requirement, the Fourth Circuit found that the treaty "requires a discrete document that initiates criminal charges." *Id.* at 363. In contrast, there is no such provision in the U.S.-Türkiye Treaty.

T.C. attempts to distinguish this line of case law by suggesting that Türkiye has not expressed an intent to prosecute T.C. Dkt. 22 at 9-10. In making this argument, T.C. relies on *Al-Nouri v. Blinken*, No. 22-cv-00633-PHX-GMS, 2024 WL 4436612 (D. Ariz. Oct. 7, 2024). There, consistent with the Magistrate Judge's holding and the cases cited above, the court rejected the fugitive's contention that formal charges were required where the U.S.-Iraq Extradition Treaty provided for extradition of "'any person *charged with* or convicted of'" crimes specified in the treaty. *Id.* at *9 (quoting U.S.-Iraq Treaty) (emphasis added). The fugitive conceded as much, but nevertheless argued that Iraq had incorrectly "interpreted 'charge' to mean more broadly the act of 'investigation.'" *Id.* at *10 (internal quotation marks omitted). The court rejected this argument and found that Iraq intended to prosecute the fugitive (and had thus not misconstrued "'charge' to mean anything other than accuse") based on an arrest warrant coupled with a case summary that "explicitly states that, '[b]ased on the conducted investigations, the available evidence indicates that the crimes were committed by [Petitioner] . . . .'" *Id.* (brackets and ellipsis in original). Similarly here, the arrest warrant for T.C. listing the "Offense Charged" coupled with the Istanbul 7th Criminal Judgeship of Peace's order stating "the existence of strong suspicion pointing to commission of an offence, the child pushed to offence committed the offence imputed on him and there has been a reason for detention," Ex. C at 57-59, demonstrate Türkiye's intent to prosecute T.C.

Accordingly, T.C.'s argument that Türkiye is seeking his extradition merely for questioning is without merit. To the extent Türkiye's extradition request references needing to conclude the investigation, the Turkish prosecutor should not be penalized for wanting to gather

all the relevant evidence—including T.C.'s statement—before instituting formal charges.[6]

Likewise, T.C. and his mother should not be rewarded for fleeing and thus preventing the

prosecutor from obtaining this evidence. Further, that Türkiye has previously sought the

extradition of individuals who have either been already indicted or convicted, *see* Dkt. 22 at 10-

11, as permitted by the Treaty, does not undermine the fact that the Treaty does not require formal

charges.[7]

## CONCLUSION

For the foregoing reasons, the Court should deny T.C.'s petition.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    */s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant U.S. Attorney

---

[6] Indeed, as demonstrated by the holdings of the cases cited above, it is not uncommon for foreign countries to bring formal charges only after the fugitive returns to that country.

[7] In support of his argument that formal charges are required, T.C. also cites two out-of-district magistrate judge decisions holding that the extradition court must determine "whether charges are pending against the person to be extradited in the requesting nation." *See* Dkt. 22 at 5. The first case, *In re Extradition of Salas*, 161 F. Supp. 2d 915, 923 (N.D. Ill. 2001), is a magistrate judge decision that states this requirement without citation. The second case, *In re Extradition of Sidali*, 899 F. Supp. 1342, 1346 (D.N.J. 1995), is another magistrate judge decision stating the same requirement, but citing two cases: *Bingham v. Bradley*, 241 U.S. 511, 516-17 (1916), and *Gallina v. Fraser*, 177 F. Supp. 856, 860 (D. Conn. 1959), *aff'd*, 278 F.2d 77 (2d Cir. 1960), *cert. denied*, 364 U.S. 851 (1960). However, neither *Bingham* nor *Gallina* establish or even discuss whether the extradition court must find the existence of formal, pending charges against the fugitive.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant U.S. Attorney

Dated: March 31, 2025