# MARTIN G. WEINBERG, P.C.
## ATTORNEY AT LAW

*20 PARK PLAZA, SUITE 1000*
*BOSTON, MASSACHUSETTS 02116*

———————

*(617) 227-3700*

———————

*FAX (617) 338-9538*

———————

*NIGHT EMERGENCY:*
*(617) 901-3472*

*EMAIL ADDRESSES:*

———————

*owlmcb@att.net*
*owlmgw@att.net*

May 16, 2025

**VIA ELECTRONIC MAIL**

Amy Stoller
Office of the Legal Adviser for Law
Enforcement and Intelligence
U.S. Department of State,
2201 C Street, NW, Room 4331
Washington, D.C. 20520
Extradition@state.gov

> **RE: Extradition Submission:** ▓T.C.▓▓▓▓▓▓▓▓▓

Dear Office of the Legal Adviser for Law Enforcement and Intelligence:

On behalf of ▓T.C.▓▓▓▓▓▓ – a juvenile, natural-born United States citizen – we respectfully urge you to refuse Turkey's extradition request should his pending habeas petition, *T.C. v. Kyes*, No. 24-cv-12458-ADB (D. Mass.), be denied. ▓T.C.▓▓▓▓▓, still a minor, is sought by Turkey in connection with an automobile accident that caused unintended harm – a tragedy, but one for which no formal charges or indictment in Turkey have ever been filed. Extraditing ▓T.C.▓▓▓▓▓ under these circumstances would be unwarranted and ill-advised. It would violate the letter and spirit of the U.S.–Turkey Extradition Treaty, contravene established U.S. legal principles, and place a minor, U.S. citizen at grave risk of injustice and even torture. As his counsel, we ask that you exercise your discretion to refuse extradition. Our request is based on four independent grounds addressed below:

1. **The United States has no duty to surrender its own citizens to Turkey, and Turkey would likely not extradite its nationals in comparable circumstances.**

▓T.C.▓▓▓▓▓ is a U.S. citizen, and the United States is under no treaty obligation to extradite its own nationals to Turkey. Article 4 of the governing extradition treaty explicitly provides that neither party "shall be bound to extradite its own nationals". In other words, even if all other conditions were met, the treaty permits the U.S. to refuse extradition of an American citizen as a matter of sovereign discretion. This provision is especially significant because Turkey, at least through 2019, does not reciprocate extradition in practice. [1] Turkey's laws and policies effectively bar extradition of Turkish

---

[1] *See e.g., United States v. Dermen*, 779 F. App'x 497, 501–02 (10th Cir. 2019) ("the government

nationals to the United States, and it rarely, if ever, surrenders individuals requested by our government.[2]

Because Turkey is not known to extradite its citizens to America, and our treaty imposes no duty to extradite ours to Turkey, extraditing T.C. – a U.S. citizen – would thus be a one-sided concession, undermining the principle of reciprocity that underlies international extradition. It would reward Turkey's intransigence and set a troubling precedent. Federal courts have recognized that when a foreign state's approach to extradition or its criminal process is fundamentally non-reciprocal or inconsistent with our values, it falls to the Executive Branch (and not the courts) to refuse extradition on those grounds.[3] We submit that this is such a case. Given Turkey's non-reciprocity and the discretionary nature of extraditing U.S. nationals, there is no legal or practical compulsion for the United States to surrender T.C. . To the contrary, fundamental fairness and the interests of the United States favor denial of Turkey's request.

**2. Because T.C. has never been formally charged or indicted, Turkey's request does not meet the fundamental requirements of the U.S.–Turkey Extradition Treaty or U.S. law.**

Article 1 of the U.S.-Turkish Extradition Treaty obligates extradition of persons "who are being prosecuted for or have been charged with an offense" (or convicted or sentenced, which is inapplicable here). This language reflects the core purpose of extradition: to hand over fugitives for trial or punishment, not merely for investigation or questioning. Accordingly, U.S. extradition statutes like 18 U.S.C. § 3184 have historically been applied to fugitives facing actual charges, not uncharged persons sought as witnesses or investigatory targets.

Here, Turkish authorities have not filed any charging instrument against T.C. despite more than a year of investigation. They have issued an arrest warrant for investigative purposes, seeking

---

submitted the affidavit of a U.S. official responsible for extradition requests made to foreign countries [] [declaring] (1) our extradition treaty with Turkey does not require Turkey to surrender individuals for prosecution here; (2) Turkey has largely ignored extradition requests and has granted only one in the last three years; and (3) Turkish political leaders have stated Turkey's intent not to extradite fugitives to the U.S.").

[2] To counsel's knowledge, there have been no recent extraditions from Turkey to the United States and certainly no extradition of minors being investigated for an offense that does not require knowledge or intent.

[3] *See e.g., Matter of Extradition of Sidali*, 899 F. Supp. 1342, 1349–50 (D.N.J. 1995) ("In the extradition of fugitives between sister states in this country, for example, the executive branch may sometimes elect not to return a fugitive, found to be extraditable by the courts, based upon 'fairness' concerns. Similarly here, the general fairness of a requesting country's system of justice, and how it operates in a specific case, is better left, ordinarily, to the Secretary of State. This country has chosen to enter a treaty with Turkey through the executive branch and it is the executive branch that must reconcile the high ideals of the United States with the Turkish system of justice and how it was applied to [this] case.")

2

to detain T.C. so that they can interrogate him. Indeed, the Turkish arrest warrant explicitly states that its purpose is to obtain T.C. statement "so that the investigation can be concluded," confirming that he is only a person of interest in an ongoing inquiry, not formally accused of a crime. In Turkey's own submissions, there is no indictment, no information, and no pending prosecution—merely a desire to question T.C. further. Extraditing someone under these circumstances would stretch the treaty beyond its text and intent.

Furthermore, permitting a foreign government to demand the surrender of a U.S. citizen absent any charge or trial would represent a drastic departure from established extradition practice and law.[4] Granting this request would create a dangerous precedent whereby juvenile U.S. citizens could be handed over to foreign custody on a mere suspicion or investigative pretext, before the foreign country has decided to charge them.

The U.S.–Turkey treaty does not require and indeed never envisioned such a scenario. While the treaty lets Turkey obtain witness statements through a Mutual Legal Assistance Request, extradition is allowed only after a person has been formally charged or convicted. Sending T.C. to Turkey now—before any indictment—would violate that prerequisite and could leave him in pre-charge detention for up to five years before he can contest any allegation (if one is ever brought) in court. Turkey should first do what every treaty partner is expected to do – lodge formal charges and afford basic due process – before any consideration is given to extradition. Until and unless Turkey can show that T.C. is "charged with" an extraditable offense (as the treaty requires), the United States has no obligation to and should not expend its sovereign power to deliver him into Turkish custody.

**3. T.C. has been punished through prolonged, harsh detention in the United States because of Turkey's extradition request.**

Arrested at sixteen, T.C. has spent more than eleven months in U.S. custody, enduring harsh conditions that have severely harmed his physical and mental health—treatment wholly disproportionate for an uncharged juvenile implicated in a traffic accident causing a tragic death.

Immediately after his arrest, T.C. was held at Manson Youth Institution (a contracted juvenile detention facility in Cheshire, Connecticut) under harsh conditions. For the first three days, he was kept in isolation, in a cell illuminated 24 hours a day, and denied even basic items like a pillow or any personal belongings. This was not a disciplinary or medical segregation – there was no rule

---

[4] In other published decisions involving the relevant treaty, the extradition requests were not based on an arrest warrant seeking further investigation. Instead, they rested on a court decision—described as "like an Indictment"—or an actual judgment of conviction indicating that the Turkish government itself distinguishes a prosecution from an investigation. *See In re Extradition of Atuar*, 300 F. Supp. 2d 418, 422 (S.D.W. Va. 2003) (finding that a "March 20, 1992, Decision of the State Security Court of the Republic of Turkey charging [relator] with selling and purchasing heroin in violation of Articles 403/5, 6, and 7 of the Turkish Criminal Code and stating in detail the factual basis for the charges" "is a charging document somewhat like an Indictment which justifies the issuance of an arrest warrant in the United States"); *Matter of Extradition of Sidali*, 899 F. Supp. 1342, 1347 (D.N.J. 1995) ("the Court finds that the judgment of the Turkish Court, when considered in light of Turkish law, constitutes a final judgment or 'conviction'.").

infraction or mental health crisis justifying it. Despite his young age and the absence of any charges, T.C. ▓▓▓▓ was subjected to the kind of extreme isolation typically reserved for dangerous offenders. This initial experience caused him significant distress. Worse was to follow.

In July 2024, T.C. ▓▓▓▓ was transferred to the Essex County Correctional Facility in Newark, New Jersey. Just days after arriving at Essex, T.C. ▓▓▓▓ was brutally assaulted by another inmate – an assault guards had warned might occur because of his race – triggered simply because T.C. ▓▓▓▓ asked to use the phone when it was his turn. He sustained injuries and was left deeply shaken. In response, officials moved T.C. ▓▓▓▓ into a so-called "protective" unit – but this essentially meant indefinite solitary confinement for his own safety. For the ensuing period of many weeks, T.C. ▓▓▓▓ was held in his cell for 22 to 23 hours per day, with limited human contact or access to education and recreation. This prolonged isolation, though meant to shield him from violence, inflicted its own severe harm. T.C. ▓▓▓▓ felt unsafe and utterly alone, as he remained surrounded by hostile inmates and subjected to continuing and ongoing threats of violence even in the segregated unit. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Following approximately four months in the custody of Manson and Essex, judicial intervention finally secured his transfer to the Massachusetts Department of Youth Services.

In sum, T.C. ▓▓▓▓'s time in U.S. detention at the request of the Turkish government has been marked by violence, fear, and trauma. The conditions he endured – from round-the-clock isolated lockdown to physical assault – are profoundly injurious. It is no exaggeration to say that he has already undergone a form of punishment, despite not being convicted of (or even charged with) any crime. To extradite him now, after this year-long ordeal, would be to double down on a grave injustice. Humanitarian considerations weigh strongly against subjecting T.C. ▓▓▓▓ to further incarceration, especially abroad. The Secretary of State's discretion in extradition cases has historically been exercised to prevent undue hardship or disproportionate outcomes.[5] We submit that T.C. ▓▓▓▓ case presents a compelling example where compassion and equity should preclude transfer. Any further detention – let alone in the far more perilous conditions of a Turkish prison – would be grossly disproportionate to the tragic automobile accident at issue.

4. **Extraditing T.C. ▓▓▓▓ to Turkey would expose him to prison conditions and practices that amount to torture or cruel treatment, in violation of the United States' obligations under the U.N. Convention Against Torture (CAT) and fundamental human rights standards.**

The U.S. Department of State's own recent reports on Turkey document a pattern of severe abuses in Turkish custody, including torture of detainees (adults and children alike), gross overcrowding, inadequate medical care, and lack of due process. These conditions are so extreme that transferring T.C. ▓▓▓▓ into them would almost certainly result in mistreatment that no juvenile or U.S. citizen should be forced to endure, and which our country is legally bound to prevent.

According to the State Department's 2023 Human Rights Report on Turkey, "[p]rison and

---

[5] *Matter of Extradition of Sidali*, 899 F. Supp. 1342, 1349–50.

detention centers were overcrowded. Prisoners often suffered from the consequences of overcrowded facilities, poor sanitary conditions, and a lack of adequate medical care.[6] The report found that inmates are frequently denied basic necessities: "prisoners sometimes lacked adequate access to potable water, proper heating, ventilation, lighting, food, and health services, and prison overcrowding and poor sanitary conditions exacerbated health."[7] Furthermore, "human rights associations expressed serious concern regarding the inadequate provision of health care to prisoners," noting an insufficient number of prison doctors and frequent interference by authorities in medical decisions.[8] Disturbingly, "some doctors refused to issue medical reports alleging abuse due to fear of reprisal. As a result, victims were often unable to get medical documentation of their abuse."[9] In short, a detainee in Turkey – especially someone like T.C. ▮▮▮▮▮ who is accused in a sensitive case – cannot expect to receive proper care or protection. Instead, he would face a system where neglect, lack of medical treatment, and even concealed abuse are commonplace.

Most alarming are the well-substantiated torture allegations, which the U.S. State Department has found to be "credible", including "enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by the government or on behalf of the government; arbitrary arrest or detention; serious problems with the independence of the judiciary…."[10] A review by the U.N. Committee Against Torture similarly found "serious concern" over "allegations of police torture or ill-treatment of detainees, including children" like T.C. ▮▮▮▮▮.[11] These allegations include **"beatings, sexual assault and harassment by security and intelligence officials, and in some cases electric shocks and waterboarding."[12]** The Committee also found "numerous cases of inadequate medical care, poor conditions of detention and ill-treatment of prisoners with health problems."[13] Such findings echo a consistent pattern: journalists, political detainees, and ordinary citizens alike have reported being tortured or severely abused while in Turkish custody. Overcrowded prisons, combined with a climate of repression, have led to death or serious harm from abuse. In T.C. ▮▮▮▮▮ case, these risks are not speculative – they are foreseeable and documented by our own Department of State.

Extraditing T.C. ▮▮▮▮▮ under these conditions would contravene America's legal and moral obligations under CAT and related human rights law. Article 3 of CAT provides in no uncertain terms:

---

[6] U.S. Sec. of State Human Rights Report on Turkey, at 5, available at https://www.state.gov/wp-content/uploads/2024/02/528267_TU%CC%88RKIYE-2023-HUMAN-RIGHTS-REPORT.pdf

[7] *Id.* at 6.

[8] *Id.* at 5-6.

[9] *Id.* at 6.

[10] *Id.* at 1.

[11] UN Committee against Torture: Review of Turkey, available at https://www.hrw.org/news/2016/04/22/un-committee-against-torture-review-turkey.

[12] Turkish Prisons Report (2016-2024), Health Challenges in Prisons – Death Cases and Suicides, Exhibit 1 at 77-78.

[13] *Id.*

"No State Party shall expel, return (refouler) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." This principle of non-refoulement is absolute – there are no exceptions. The United States has implemented it through the Foreign Affairs Reform and Restructuring Act of 1998, which makes it "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." In practice, this means that if extradition would likely result in torture or cruel treatment, the Secretary must decline to surrender the person. Here, given the overwhelming evidence of how detainees are treated in Turkish prisons there are more than "substantial grounds" to believe T.C.         would be in danger. To extradite him would be to knowingly place a U.S. citizen in the hands of a system that practices torture and inhumane punishment. Such an outcome is unequivocally prohibited. The only lawful and humane course is to refuse extradition.

In short, we submit that every factor weighs against extradition here. Upholding Turkey's request to extradite a minor, not accused or even charged with an intentional offense, would not only endanger T.C.      s life and well-being but also set a precedent that juvenile U.S. citizens can be handed over without a charge to a country known to mistreat prisoners and rebuff U.S. extradition requests.

We reserve the right to supplement this submission and ask that you postpone any decision until we can give a more complete presentation—at least via Zoom—where we can provide further supporting documents.

Thank you for your attention to this matter.

Respectfully submitted,

Martin G. Weinberg, Esq.
Maksim Nemtsev, Esq.
Victoria Kelleher, Esq.